ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
TRACY L. WILKISON (Cal. Bar No. 184948)
Assistant United States Attorney
Cyber and Intellectual Property Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-0622
     Facsimile:  (213) 894-0141
     E-mail:     tracy.wilkison@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                 UNITED STATES DISTRICT COURT

            FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,        No. CR 13-56-GHK

          Plaintiff,             GOVERNMENT'S SENTENCING POSITION
                                 AND OPPOSITION TO DEFENDANT'S
               v.                SENTENCING POSITION; EXHIBITS
                                 FILED CONCURRENTLY UNDER SEAL
KAREN KAZARYAN,
aka "Gary Kazaryan,"

          Defendant.


          Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorney Tracy L. Wilkison,

hereby files its sentencing position and opposition to defendant

Karen Kazaryan's sentencing position.

1       This Opposition is based upon the attached memorandum of points

2   and authorities, the exhibits filed concurrently under seal, the

3   Presentence Investigation Report and recommendation letter, the

4   files and records in this case, and such further evidence and

5   argument as the Court may permit.

6

7   Dated: November 22, 2013          Respectfully submitted,

8                                     ANDRÉ BIROTTE JR.
                                      United States Attorney
9
                                      ROBERT E. DUGDALE
10                                    Assistant United States Attorney
                                      Chief, Criminal Division
11

12                                    _____/s/_____
                                      TRACY L. WILKISON
13                                    Assistant United States Attorney

14                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

**DESCRIPTION**                                                                    **PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION....................................................1

II.   DEFENDANT'S OBJECTIONS SHOULD BE OVERRULED.....................3

      A.    Defendant's Victims Number More Than 250................3

      B.    Defendant's Offense Involved Sophisticated Means........7

III.  DEFENDANT DESERVES AN UPWARD DEPARTURE........................9

IV.   BASED ON THE § 3553 FACTORS, A SENTENCE OF 72 MONTHS IS
      APPROPRIATE..................................................15

      A.    18 U.S.C. § 3553(a)(1).................................15

      B.    18 U.S.C. § 3553(a)(2).................................21

      C.    18 U.S.C. § 3553(a)(6).................................22

V.    CONCLUSION...................................................25

1

**TABLE OF AUTHORITIES**

2

**DESCRIPTION**                                                                 **PAGE**

3

**Cases**

4

Nichols v. United States,
    511 U.S. 738 (1994)...................................................19

United States v. Barrington,
    648 F.3d 1178 (11th Cir. 2011)........................................5

United States v. Blixt,
    548 F.3d 882 (9th Cir. 2008).........................................4

United States v. Feigin,
    2010 WL 376278(11th Cir. 2010) ......................................24

United States v. Gonzalez,
    541 F.3d 1250 (11th Cir. 2008).......................................15

United States v. Ledgard,
    2012 WL 3996855 (C.D.Ca. September 12, 2012).........................5

United States v. Moon,
    513 F.3d 527 (6th Cir. 2008).........................................15

United States v. Popa,
    361 Fed.Appx. 854 (9th Cir. 2010)....................................4

United States v. Watts,
    519 U.S. 148 (1997)..................................................19

5

6

7

8

9

10

11

12

13

14

15

16

17

**Statutes**

18

18 U.S.C. § 1028(d)(7)...................................................3

18 U.S.C. § 1028A(a)(1)................................................2, 4

18 U.S.C. § 1030(3)(2)..................................................10

18 U.S.C. § 2252A.......................................................11

18 U.S.C. § 3553(a)............................................15, 21, 22

18 U.S.C. §§ 1030(a)(2)(C)...............................................1

19

20

21

22

23

24

**Rules**

25

U.S.S.G. § 2B1.1...................................................passim

26

27

28

ii

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        Defendant Karen Kazaryan, aka Gary Kazaryan, is a sexual cyber

4   terrorist.  He hacked into hundreds of victims' email, Facebook, and

5   Skype accounts using their usernames and passwords or password reset

6   questions.  He then methodically searched their accounts for naked

7   pictures, passwords, and the contact information of their friends.

8   He had two goals every time that he accessed these accounts: get

9   more naked pictures in any way he could, and get more victims.  Once

10   he had access to an account, he would take over the account and

11   pretend to be that person to her friends.  He would persuade the

12   friends to show him their breasts or provide naked pictures.  He

13   also persuaded them to provide their usernames and passwords so that

14   he could obtain access to their accounts too.  Once he had stolen

15   the naked pictures from these women, he went further, returning to

16   them in the guise of another victim account, and demanding that they

17   provide him with more sexually explicit videos.  He "sextorted"

18   their compliance, forcing them to strip for the camera while he took

19   yet more pictures.  He was indifferent to their pain, to their pleas

20   to stop, and to their requests for privacy.  If they hesitated at

21   all, he posted previously obtained pictures publicly, causing the

22   horrified victims to receive calls from other friends about how

23   their entire friend network could now see them naked.  His victims

24   were devastated and felt like they had been raped.  They continue to

25   be thoroughly traumatized by his criminal conduct.

26        For his crimes, defendant was charged with fifteen counts of

27   unauthorized access of protected computers, in violation of 18

28   U.S.C. §§ 1030(a)(2)(C), (c)(2)(B)(ii), and fifteen counts of

1

aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). He pleaded guilty on July 15, 2013, to one count each of unauthorized access and aggravated identity theft, pursuant to a written plea agreement.

On September 3, 2013, the United States Probation Office issued its Presentence Investigation Report ("PSR") in this matter.  The PSR calculated a total offense level for the unauthorized access count as 13, and found defendant to be in Criminal History Category I, and found the advisory guideline range, with the mandatory consecutive sentence of two years imprisonment, to be 36 to 42 months.  Recognizing that the Sentencing Guidelines do not adequately address defendant's crimes, the Probation Office recommended a sentence of 48 months' imprisonment.

The government has no objections to the Guideline calculations. On November 20, 2013, defendant filed his sentencing position.  In it, he first makes two objections to the PSR: (1) to the six level increase for number of victims in paragraphs 73-78; and (2) to the two level increase for sophisticated means in paragraphs 79-82.  He then argues for a sentence of 30 months' imprisonment based on the Section 3553(a) factors.

Because defendant's objections lack merit, they should be overruled.  Moreover, for the reasons set forth below, including the fact that the sentencing guidelines do not adequately capture defendant's sextortionate conduct, the government recommends a sentence of imprisonment of 72 months, or six years.

1    II.   **DEFENDANT'S OBJECTIONS SHOULD BE OVERRULED**

2         A.   **Defendant's Victims Number More Than 250**

3         Defendant first objects to the increase of six levels for more

4    than 250 victims on the basis that victims who had their usernames

5    used without authorization are not properly counted as victims, and

6    that the number of victims includes only those named in the

7    Indictment.   Defendant's objections lack merit and should be

8    overruled.

9         The PSR correctly states that Application Note 4(E)(ii) to

10   U.S.S.G. § 2B1.1 affirms that for purposes of calculating the number

11   of victims, in a case involving means of identification, "victim"

12   means any individual whose means of identification was used

13   unlawfully or without authority.   "'Means of identification' has the

14   meaning given that term in 18 U.S.C. § 1028(d)(7)." U.S.S.G. § 2B1.1

15   cmt. n.1.   Under § 1028(d)(7), "means of identification" includes

16   "any name or number that may be used, alone or in conjunction with

17   any other information, to identify a specific individual, including

18   any . . . name . . . or electronic identification number [or]

19   address."   There is no requirement, as defendant suggests, that the

20   means of identification be used in furtherance of a criminal or

21   tortious act for the individual to qualify as a victim; only that

22   the means of identification be "used unlawfully or without

23   authority."[1]

24        In this case, defendant used the unique usernames – which are

25   both names and electronic addresses under the plain language of

26

27        [1] That said, as discussed below, the victims' means of
     identification in this case were in fact used in furtherance of
28   criminal and tortious acts.

3

Section 1028(d)(7) – of more than 370 victims.  These usernames
identify persons very specifically to the provider; no two people
can have the same username at the same provider.  For example, there
may be many John Smiths, but there is only one JSmith365@gmail.com.
Indeed, in pleading guilty to count 27, which charges a violation of
Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1),
defendant agreed that these usernames were means of identification,
that he used them knowing that they belonged to real victims and
that he had no lawful authority to use them.  In the factual basis,
he agreed: "In addition, during and in relation to this unauthorized
access to a computer in furtherance of a state crime or tort,
defendant intentionally obtained, possessed and used without legal
authority a means of identification of another person, specifically
the user id for the computer accounts that he accessed.  Defendant
knew that these user ids belonged to a real person, and he acted
without their permission and without lawful authority."  CR 42.

      Defendant used these usernames to assume the victims' online
identities, connect with their friends and family, search for
images, search for new victims, fraudulently persuade victims to
pose naked on Skype, and extort other victims to pose naked as well.
He cannot now object to the inclusion of these victims in
calculating the Sentencing Guidelines.  See United States v. Popa,
361 Fed.Appx. 854, 856 (9th Cir. 2010) (unpublished) (holding that a
defendant had committed aggravated identity theft in making drivers'
licenses that included the real names of other people, but fake
information, or Popa's information, for the remainder of the
licenses, because the names uniquely identified the victims of the
identity theft crimes);  United States v. Blixt, 548 F.3d 882, 887–

4

88 (9th Cir. 2008) (holding that a forged signature constitutes a means of identification, because it is a name in a different form, and because it, taken in conjunction with other information as a whole, will identify a specific individual. "[Section 1028] includes the use of a name, alone or in conjunction with any other information, as constituting the use of a means of identification so long as the information taken as a whole identifies a specific individual. There is nothing in the language of the statute that suggests the use of another's name in the form of a signature is somehow excluded from the definition of 'means of identification.'"); United States v. Barrington, 648 F.3d 1178, 1193 (11th Cir. 2011) ("[c]learly, the usernames and passwords, considered together, constituted a 'means of identification' for those specific individuals and [the defendant] knew that."); United States v. Ledgard, 2012 WL 3996855, *14 (C.D.Ca. September 12, 2012)(defendant found guilty of Section 1028A by Judge Pregerson based on his use of victim's username to access account); United States v. Mijangos, 10-743-GHK (C.D.Ca. September 1, 2011)(Court imposed enhancement based on number of victims whose usernames were used, finding that the screen names are a means of identification).

Defendant's objection as to the number of victims also fails. Every time defendant accessed an email, Facebook, or Skype account, he necessarily had to use the username and either the password or the password reset questions. He could not have gained the access to the accounts without using the means of identification. The usernames that defendant used to access accounts are separately filed under seal in Exhibit A. Exhibit A contains lists of accessed accounts obtained in one of two ways: (1) based on the evidence on

defendant's computer, found during the search in this case, which showed him accessing other people's accounts; (2) based on records maintained by Facebook, Yahoo, and Google, which showed defendant's IP address accessing other people's accounts.  The lists have been cross-referenced, and duplicates or persons with multiple accounts have been deleted.  What remains is 372 individual victims identified as having their accounts actually accessed through defendant's use of their username, not simply the nine victims named in the indictment.  The six-level increase for more than 250 victims is entirely appropriate.

Defendant objects that if the victims did not know that their accounts were hacked, then they cannot be counted as victims, and further asserts that there is no evidence that the usernames were used in furtherance of a criminal or tortious act.  These objections lack merit.  First, nothing in the Sentencing Guidelines supports defendant's suggested amendment to the definition of "victim." Second, the entire point, the raison d'etre, of defendant's unauthorized use of his hundreds of victims' means of identification was to gain access to their accounts so that he could (1) search for naked pictures to steal; (2) pose as the victim to allow him to victimize others; and (3) gain the usernames and passwords of other victims, all in violation of Extortion, Threatening Letters, False Personation, Identity Theft, and Contact by Electronic Communication with Intent to Annoy, in violation of California Penal Code Sections 518, 520, 523, 530, 530.5, and 653m, respectively, and the California State Torts of Intentional Infliction of Emotional Distress and Invasion of Privacy.  The evidence on defendant's computer confirms that defendant methodically worked to expand his

victim network and to terrorize yet more people.  Defendant's assertion that the majority of the victims in this case suffered "neither actual nor emotional loss, nor were inconvenienced," flies in the face of reality.

Defendant's objection should be overruled and the six-level enhancement applied.

**B.    Defendant's Offense Involved Sophisticated Means**

Defendant next objects to the two level increase for sophisticated means.  U.S.S.G. § 2B1.1(b)(9)(C) states: "if . . . the offense otherwise involved sophisticated means, increase by 2 levels."  The commentary explains that "sophisticated means" include:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(9)(C), cmt. n.8(B).

As the PSR points out, defendant's activities in this case involved hiding transactions through the use of fictitious entities or names.  PSR, ¶ 82.  His computer showed evidence of programs designed to hide his IP addresses so that he could further conceal his crimes from law enforcement.  PSR, ¶¶ 81, 82.

Indeed, defendant's crimes were "especially complex" and especially intricate," both in the execution and concealment of the offense.  Defendant took elaborate steps to take over as

many victim accounts as possible, so that he could use his victims as a shield in order to gain the trust of other victims.  He would pose as one victim, and ask others for their passwords or password reset information.  For example, the Skype chat filed under seal as Exhibit B shows defendant as one victim, first asking the second victim to "flash" him, and then, pretending that he can solve a computer problem, asks for her username and password (at line 609-14).  The second victim, thinking that she is speaking with the first victim, supplies it.  Defendant would then access her accounts and network out from there to find other victims.  This happened numerous times with many different victims.

Defendant also used his ability to access victim accounts to obtain naked pictures, pretending to be one victim to gain the confidence of another so that she would show her naked breasts to him.  Once he had that, he would extort more sexual activity from the second victim.  For example, in the Skype chat filed under seal as Exhibit C, defendant on one day pretended to be the first victim and fraudulently persuaded the second victim to show her breasts.  When she did, he took a picture of her and saved it on his computer.  He then came back a second day, and was able to extort her into revealing her breasts again and again took pictures.  Defendant did this frequently and with many of his victims.  As detailed above, he ultimately was able to access and take over well over 350 online identities, and he had over 1,100 naked or semi-naked pictures of women on his computer.

Defendant contends that because the government was able to
successfully investigate defendant's crimes, they were not
sophisticated.  However, the fact that ultimately, the
government was able to track down defendant's IP addresses to
his home and work, and discover evidence of his crimes on his
computer, does not make defendant's crimes unsophisticated.  If
prosecution equalled unsophisticated, the enhancement would
never be applied.  Similarly, defendant's argument that the
sophisticated means enhancement is duplicative of USSG
§ 2B1.1(b)(16)(a) (applying a two-level increase for a § 1030
offense where there was intent to obtain personal information)
fails; not all unauthorized computer access cases are
necessarily exceptionally sophisticated.  Here, the enhancement
is appropriate because defendant designed special precautions
in setting up his crimes specifically in order to avoid
detection and to continue extorting his victims.  Defendant's
crimes were more complex than the average case under this
Guideline.  Given both the intricacy and the level of
concealment of defendant's crimes, he qualifies for the
sophisticated means enhancement, and defendant's objection
should be overruled.

**III. DEFENDANT DESERVES AN UPWARD DEPARTURE**

The Probation Office recommends a sentence of 48 months'
imprisonment, which includes a six-month upward departure from the
Sentencing Guidelines.  The government agrees that an upward
departure is warranted, but recommends a 30-month upward departure,
for an ultimate sentence of 72 months.  In the alternative, the
government recommends a variance under Section 3553(a), as discussed

below, to the same sentence, based on defendants conduct, history, and circumstances.

U.S.S.G. § 2B1.1 is the Guidelines section used for section 1030 offenses like that to which defendant has pleaded guilty.  This is the same section used for offenses involving, among other things, theft, stolen property, property damage or destruction, fraud, forgery, and counterfeiting.  Accordingly, the section generally gauges the seriousness of the offense by the amount of monetary loss.  The commentary recognizes, however, that an upward departure is warranted where the nature of the crime is non-monetary.  See U.S.S.G. § 2B1.1 cmt. n.19.  Among the non-exhaustive list of factors warranting an upward departure are the following:

> (i) A primary objective of the offense was an aggravating, non-monetary objective. For example, a primary objective was to inflict emotional harm.

> (ii) The offense caused or risked substantial non-monetary harm. For example, the offense cause physical harm, psychological harm, or severe emotional trauma, or resulted in substantial invasion of a privacy interest (through, for example, the theft of personal information such as medical, educational, or financial records). . . .

> (v)  in a case involving stolen information from a protected computer," as defined in 18 U.S.C. § 1030(3)(2), the defendant sought the stolen information to further a broader criminal purpose.

The PSR recommends an upward departure on this basis, but the government respectfully submits that the departure does not go far enough.  In this case, a substantial, 30 month, upward departure is warranted for this defendant because the monetary adjustments in § 2B1.1 do not properly capture the seriousness of defendant's conduct, nor the true loss to the victims.

1      Here, defendant was not motivated at all by monetary gain.

2   There is no increase for loss in this case.  Rather, defendant's

3   currency was naked pictures of women, and, using that measure, there

4   was substantial loss to the victims.  Defendant intentionally hacked

5   into his victims accounts, made contact with his victims, and played

6   psychological games with them intending to inflict emotional harm.

7   The nonchalant manner in which he terrorized these women for his own

8   pleasure, and the scale on which he did it, are disturbing.  In one

9   chat, defendant called it his "hobby."  Exhibit D, line 589.  Some

10  of the images were of minor girls, and thus child pornography or

11  child erotica, which is itself a very serious crime.  See 18 U.S.C.

12  § 2252A; USSG § 2G2.2.  On defendant's computer, agents discovered

13  more than 8,000 instant message chats where defendant was attempting

14  to obtain email accounts and account passwords and pictures of naked

15  or semi-naked women and sexually explicit conduct.  PSR, ¶ 62.

16  There were more than 1,100 saved photos of naked or semi-naked

17  women.  Id.  There is nothing in the Sentencing Guidelines

18  calculation that accounts for that loss.  Indeed, if each naked

19  picture were afforded the same loss calculation as an unused credit

20  card, a conservative loss estimate would be $550,000, or an increase

21  of 14 levels (gained at any loss beyond $400,000).  The resulting

22  Guideline would be 70-87 months, plus two years consecutive for the

23  Section 1028A conviction, for a total Guideline sentence of 94-111

24  months.

25      Moreover, as the PSR points out, the account holder victims

26  reported that defendant changed their passwords multiple times,

27  locking them out of their accounts.  They were forced to cancel

28  accounts, start new ones, and re-establish contact with friends.

11

The guidelines do not account for the fact that the victims spent
many hours attempting to undo the damage that defendant caused to
their accounts and the severe invasion of their privacy.

An upward departure is also appropriate because Section 2B1.1
does not adequately address the intentional infliction of emotional
distress that defendant visited upon his victims.  The PSR well
discusses a small sampling of the emotional trauma and psychological
harm that the victims suffered at defendant's hands.  PSR, ¶¶ 35-60.
The government also attaches as Exhibits B-E some of the instant
message chats (4 out of 8,000) found on his computer.  Each time
defendant gained access to an account, he would plunder it searching
for pictures he could steal and use to extort further pictures,
passwords he could steal and use to get into other accounts, and
contacts that he could victimize next.  With total disregard for his
victims, defendant would take pictures of those who trusted he was
who he said he was, and use them to further extort the victims.  As
the Probation Office notes in the recommendation letter, "not only
was this conduct egregious, defendant's callousness and complete
disregard for the demand victim is evident in that he would 'allow'
the demand victim to cover her face when he took the naked or semi-
naked body pictures of the demand victim."

Defendant's assaults took a tremendous toll on his victims.
They lost their privacy.  They felt raped.  And for many of them,
realizing that defendant was someone they knew was further
victimization.  As the PSR states, many of defendant's victims were
people that he knew or went to school with.  PSR, ¶ 29.  He used his
knowledge of these people to gain access to their accounts, and then
spread out to other victims.  For this reason, many victims have

12

reported to the government an extreme reluctance to appear in court
to see their former friend or acquaintance, and all have requested
that their names not be used in any letters to the court.  For
example, filed under seal as Exhibit F is a letter from one victim
who is too scared to be named.  This victim is one who was sextorted
by defendant into providing naked pictures.  She writes that the
fear caused by defendant has still not left her mind.  She states
that defendant was a family friend, and because of his abuse of her,
she says, "I am convinced that he will be a threat to both my
community and me.  He certainly made threatening comments prior to
his arrest and I fear the effects of such an individual being
released into our community, should he not face the appropriate
consequences for his crime."  She no longer feels safe on the
Internet based on his manipulation of her.

Other victims reported the effects of defendant's crimes when
they spoke with law enforcement.  These reports are filed under seal
as Exhibit G.  For example, victim S.A. (referenced at PSR, ¶¶ 57-
60) stated that she feels "threatened and terrorized" by defendant.
She closed down her accounts and created new ones.  She was very
scared that her photos would get out and damage her reputation.
This fear about photos becoming public and damaging their reputation
is one repeated in the Skype chats, for example at Exhibit D, line
593, and is the main means by which defendant was able to coerce his
victims:  by threatening to publicly post the pictures he already
had.

As another example, victim S.D. (PSR, ¶¶ 55, 56) reported that
she "was very scared, could not sleep and felt traumatized.  She is
still very paranoid about using computers and instant messaging with

13

friends." Victim D.M. (PSR, ¶¶ 47-51) stated that she "is emotional[ly] distraught and cried profusely for the rest of the evening [following the extorted provision of naked pictures]." She stated that she "felt like she was raped, and was scared to log into her email account." Victim H.K. (PSR, ¶¶ 57-60) stated that she feels "threatened and terrorized" by defendant. She had closed down her Facebook account, changed her email accounts, and was fearful of using the Internet and computer. At a later interview, she stated that she felt threatened, scared, and attacked. Victim M.M. (PSR, ¶¶ 43-46) stated that she was upset, and fearful, and had to close down all of her email and social media sites. She stated that she experienced depression, and continues to be upset about it. Victim A.A. (PSR, ¶¶ 37-42) said that she felt "extremely violated" and was fearful of what defendant would do with the photographs he obtained. Victim H.A., whose naked picture was posted on victim C.P.'s Facebook page by defendant as an incentive to get victim H.A. to show him her breasts (PSR, ¶ 36), felt scared and unsafe. She reported calling victim C.P. during the attack, crying, and asking her to take down the picture and delete all of her friends. Ultimately, Victim H.A. deactivated her Facebook account and still feels scared.

Given the extreme emotional violence that defendant visited upon these women, and given the persistent and pervasive efforts by defendant to victimize as many people as possible, the six-month upward departure recommended by the Probation Office is insufficient to fully capture his conduct. The government recommends a sentence of 72 months, or a 30 month upward departure, because nothing less can account for the true loss defendant caused. Indeed, as noted,

the recommendation is less than what would result from an
approximate monetization of defendant's currency of choice: naked
pictures of women, obtained without their consent and against their
will.

**IV.  BASED ON THE § 3553 FACTORS, A SENTENCE OF 72 MONTHS IS
      APPROPRIATE**

Taking the advisory Guidelines into consideration, including
the upward departure, the government believes that a sentence
including 72 months' imprisonment is sufficient but not greater than
necessary to comply with the enumerated purposes of sentencing and
the factors set forth in 18 U.S.C. § 3553(a).

**A.    18 U.S.C. § 3553(a)(1)**

  **1.    <u>Nature and Circumstances of the Offense</u>**

18 U.S.C. § 3553(a)(1) requires the Court to consider the
nature and circumstances of the offense and the history and
characteristics of defendant.  As discussed above, defendant's
crimes and the impact on his victims were truly terrible.  The
emotional distress caused to the victims is a necessary part of the
evaluation of the nature and circumstances of defendant's offense.
<u>See</u>, <u>e.g.</u>, <u>United States v. Moon</u>, 513 F.3d 527, 534 (6th Cir. 2008)
(affirming sentence where district court permitted testimony of
relatives of deceased patients as relevant to nature and
circumstances of the fraud offense).  Some courts have considered
harm to the victim under Section 3553(a)(2) as well.  <u>See</u>, <u>e.g.</u>,
<u>United States v. Gonzalez</u>, 541 F.3d 1250, 1254 (11th Cir. 2008)
(noting district court's consideration of "desperation of the
victims" when considering the nature and circumstances of offense
and harm to victims when considering the need to reflect the

15

seriousness of the offense, to promote respect for the law, and to
provide just punishment).

In this case, defendant attacked his victims on an almost daily
basis.  For example, Exhibit H is a chart compiled with Facebook
records of accounts accessed from defendant's home IP address and
shows that defendant, just between November 1, 2010 and February 23,
2011, accessed his victims' accounts almost daily.  Notably, the
chart does not include the times he accessed the accounts from his
work IP address, nor does it include the entire year of 2010 that he
was accessing victim accounts, nor does it include any access beyond
Facebook.  It nonetheless speaks powerfully about defendant's
dedication to his crime.

In addition, the captured instant messages themselves
demonstrate defendant's callousness, his abuse of power, and his
complete disrespect for women.  For example, in Exhibit D, defendant
posed as victim T.M., and had a Skype conversation with victim M.M.
In his Skype conversations with victims, defendant was able to
persuade his victims that his video camera was malfunctioning, and
he could type his part of the conversation while watching the victim
on her camera.  After he persuaded M.M. to show him her breasts, he
later spoke with her and demanded that she "flash me regularly."  He
was completely dismissive of her statements that she could report
him and threatened to post the picture of her flashing him on all of
her friends' accounts.  He said "at this point I have power," and
ignored her pleas to stop.  When she expressed concern that he was
going to ruin her good reputation, he was unmoved and continued to
demand the naked pictures.

16

In Exhibit C, defendant posed as victim A.P. and victimized
victim A.A.  Again, after gaining a picture of her flashing by
fraud, he returned to demand more.  He trivialized her attempts to
fight back, and flippantly said that he had "incentives" to cause
A.A. to "flash[] me for about a minute and play with her boobs… I
don't care if her face is in it."  He said if she did, "I wont
facebook the picture of her flashing :)"  He was indifferent to her
cries for mercy and demanded that she appear on screen "no face 2
min topless and just rub your boobs."  He pretended not to be "some
Armenian person that we know," as she was concerned about that, and
further demanded her compliance.

These chats comport with the reports by other victims of the
horrific nature of defendant's conduct.  The conduct was also
repeated and long-lasting for well over a year, and involving
hundreds and hundreds of victims.  The sheer volume of defendant's
hacks and victims sets him apart.  It can be no understatement to
say that the nature and circumstances of the offense call for a very
significant sentence.

Defendant contends that a lower sentence is appropriate in this
case because "there were [no] attempts to circulate any comprising
[sic] pictures into the general public domain."  This is absolutely
not true.  Defendant repeatedly posted naked pictures of his victims
onto their, or their friends', Facebook pages in order to force them
to show him their breasts.  He showed no remorse about doing so, and
about threatening to do so, in his communications with the victims;
rather, he seemed quite smug about his power.  Moreover, defendant's
argument that he should be given a lower sentence because he has
"spared the victims the stress, anxiety and obvious personal and

17

emotional apprehension that comes from having to testify in open court about the events in question" is offensive given the stress, anxiety, and obvious personal and emotional apprehension he has already given them.

### 2.    Defendant's History and Circumstances

Defendant is a 27-year-old man who has been a daily marijuana user with a spotty employment record.  He received an associate's degree, and "is skilled in marketing and the creation of website concepts."  PSR, ¶ 148.  However, he chose to use those skills to break the law and victimize others.  Defendant argues that he was young at the time of the offense, and so now he "obviously has the intellect to control any further inappropriate, impulsive actions"; however, there is no evidence that this is true.  Defendant was 24 and 25 at the time of the offense.  This is well after when most people graduate college and many have been working for years.  There is nothing to substantiate defendant's assertion that he lacked that intellect two years ago but suddenly has it now.[2]

Defendant's prior arrest for rape of an unconscious person, oral copulation of an unconscious person, sexual penetration by a foreign object, rape by use of drugs, and oral copulation by anesthesia or controlled substance must be considered.  While it did not result in conviction, it cannot be ignored as evidence of defendant's character and regard for others.  Defendant was

---

[2] Defendant also claims that he has strong family and community support.  However, he had this support before and it did not affect his choices.  Moreover, the quality of this support is dubious: as was learned during the detention hearings in this case, his parents are both convicted felons for welfare fraud, and his brother also has a lengthy felony criminal record.  Notably, only one family member chose to write a letter in support.

identified by a victim of rape as the perpetrator.  She stated that

defendant offered her a drink at a bar, and that after that she

could not remember exactly what happened.  She reported that she

next remembered defendant raping her in the back seat of a car.  Her

friends reported that she was near unconscious in the car when they

discovered her.  Defendant acknowledged in a recorded inmate call

that he had sexual contact with the victim, but alleged it was

consensual.  PSR, ¶¶ 104-114.

Defendant submits that the case was not dismissed for failure

to bring the case to court in time, as the PSR states, but says that

that the case was instead dismissed because the prosecution had

insufficient evidence to proceed to trial.  This is false.[3]  The

undersigned has spoken with the Deputy District Attorney assigned to

the case, and she stated that the case had been set for trial

following a preliminary hearing.  Unfortunately, the investigating

officer had failed to stay in touch with a key witness, S.V., who

had graduated from college and moved to parts unknown.  The Deputy

District Attorney stated that she dismissed only because this

witness could not be located.  She did not base the dismissal on any

alleged evidence regarding the victim, as defendant asserts,

especially given that the victim was unconscious during the attack.

Rather, she stated that that the victim wanted to proceed, and there

---

[3] Even if it were true, the inability to prove the rape beyond a
reasonable doubt would not preclude its consideration at sentencing.
Nichols v. United States, 511 U.S. 738, 747 (1994) (sentencing court
may consider conduct that did not result in conviction without
violating Due Process); see also United States v. Watts, 519 U.S.
148, 157 (1997) ("a jury's verdict of acquittal does not prevent the
sentencing court from considering conduct underlying the acquitted
charge, so long as that conduct has been proved by a preponderance
of the evidence.").

1  was also substantial DNA evidence tying defendants to the crime, so
2  that if S.V. ever can be located, and it is within the statute of
3  limitations, she intends to re-file the case.[4]

4     Defendant's prior rape charge, as well as defendant's other
5  pending drug charges as discussed at paragraphs 115-123 of the PSR,
6  are very telling.  The crimes for which defendant stands convicted
7  ultimately have a lot of similarity to the prior allegations.  Both
8  represent an abuse of power, a lack of respect for women and their
9  personal space, and an extreme absence of judgement.  It also makes
10 clear that defendant's criminal history calculation, showing zero
11 points, does not adequately convey defendant's contact with, and
12 disregard for, law enforcement.  Defendant's conduct in this case
13 occurred while the rape case was pending, and the drug charges began
14 after the search warrant in this case was executed.  In truth,
15 defendant has no regard for law enforcement, or other people,
16 specifically women.

17     Defendant also claims that he was "more of a voyeur rather than
18 a sexual predator wanting physical contact with the victims," and
19 that there is no danger of further inappropriate conduct.  He points
20 to the report of Dr. Ronald Markman in support.  As a starting
21 point, Dr. Markman's report is useless, and should be wholly
22 rejected.  As background to prepare himself for this case, Dr.
23 Markman read <u>only</u> the indictment.  Defendant's Exhibit A, page 1.
24 He did not read any of the discovery, or the PSR, or any other
25 materials.  He did not read the exhibits attached to this position

26

27     [4] In defendant's report, attached as Exhibit A, Dr. Markman
   repeats the defendant's statement that the case has been dismissed
28 with prejudice.  This is also false.

1  and produced in discovery.  He did not read the reports of

2  interviews with the victims.  He did not read any of the reports

3  from defendant's prior rape offense.  Then, Dr. Markman met with

4  defendant <u>once</u>, in his office, for what one can imagine was at most

5  a couple of hours.  Defendant's Exhibit A, page 1.  No tests were

6  performed.  And, in fact, no critical thinking was engaged, as Dr.

7  Markman's report simply recites what defendant reported to him

8  during their chat.  Based on that, Dr. Markham concludes both that

9  "there is no history of ongoing aggressive sexual misconduct" and

10  "the risk of future aggressive sexual behavior is low."  These

11  conclusions are as baseless as the evidence upon which he grounds

12  them.

13      In truth, defendant is far more than "a voyeur" who is not

14  sexually aggressive.  A voyeur, by definition, only watches from

15  afar; he does not act and does not interact.  Defendant is the exact

16  opposite.  He is a sexual cyber-terrorist, who reached out through

17  his computer to compel women to strip for him.  The women complied,

18  even though he was not physically present in the room, because to

19  them it was precisely the same.  They felt raped.  He thrived on his

20  power over the victims, and taunted them with it.  Defendant cannot

21  now pretend that because he hid behind a computer username that he

22  was not behaving aggressively.  Calling it simple "immature bad

23  judgment" drastically understates both the experience of the victims

24  and defendant's methodical, long-lasting, and horrific crimes.

25      **B.    18 U.S.C. § 3553(a)(2)**

26      18 U.S.C. § 3553(a)(2) requires the Court to consider the need

27  for the sentence to reflect the seriousness of the offense, to

28  promote respect for the law, to provide just punishment for the

offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of defendant, and to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. This factor also supports the government's recommended sentence of 72 months.

A significant period of incarceration is necessary given the serious nature of defendant's offense, including the number of victims and the depth of harm he inflicted on them. Many of the victims have reported significant fear of defendant based on his crimes. A lengthy sentence is also necessary to promote respect for the law and for specific deterrence. Defendant has had repeated contact with law enforcement and demonstrates little regard for others, especially women. In addition, defendant's punishment should be severe enough not only to serve as a deterrent for him, but also to other hackers who contemplate such activities.

**C.    18 U.S.C. § 3553(a)(6)**

18 U.S.C. § 3553(a)(6) requires the Court to minimize sentencing disparity among similarly situated defendants. While normally a Guidelines sentence helps to prevent sentencing disparities, here it would create one. As explained above, the applicable Guidelines simply do not capture the seriousness and depth of defendant's conduct, and the Guidelines themselves template this exact scenario and recommend an upward departure. This is further evidenced by the above-Guidelines sentences that have been repeatedly given to similarly-situated defendants.

In <u>United States v. Mijangos</u>, 10-743-GHK, defendant was a 32 year-old paraplegic who infected the computers of victims by sending

22

messages embedded with malicious software that gave him control over victims' computers.  He used that access to steal financial information, to obtain access into their accounts and to turn on their webcams.  He also used images of his victims to sextort them into providing more images.  Mijangos was sentenced by this Court to 72 months' imprisonment, which was an above-Guideline sentence. Mijangos had many similarities to defendant in terms of accessing accounts, and extorting victims.  While he used more technical means to access the accounts (malware instead of social engineering), and broadened his attack to include financial information, he also had significant medical issues, did not have the same large number of victims that defendant did, nor did he post the pictures publicly with anywhere near the same frequency that defendant did.

In <u>United States v. Chaney</u>, 11-958-SJO, Chaney was sentenced to 120 months' imprisonment after being convicted of unauthorized access and wiretapping.  Chaney accessed the accounts of numerous celebrities using similar methods to defendant: knowing or guessing the usernames, and then knowing or guessing the password reset answers.  After Chaney accessed the accounts, he searched for and obtained pictures of the celebrities.  He made no threats to his victims.  Chaney distributed a small amount of the pictures, but never posted them to the Internet himself.

In <u>United States v. Finkbiner</u>, 12-21-WTL (S.D. Ind.), a district court case in Indiana, the defendant was recently sentenced to 40 years in prison after tricking teens into providing sexual images and then extorting more from them.  Finkbiner, who had no criminal history, had approximately 153 victims, and had captured more than 11,000 video files with sexual conduct.

In United States v. Feigin, 2010 WL 376278, at **1 (11th Cir. 2010) (per curiam) (unpublished), Feigin was convicted for installing malware on the computer of a single adult female victim, which allowed him to capture nude images of the victim through her webcam. There was no further extortion. The victim reported a lasting impact from the crime, including insomnia, paranoia, anxiety, and issues with trust and insecurity. Id. The district court imposed a sentence nearly two times greater than the high end of the advisory Guidelines range. Id. at **6. This 30 month sentence was upheld by the Eleventh Circuit in an unpublished opinion which recognized that the financial focus of U.S.S.G. § 2B1.1 failed to capture the deliberate invasion of privacy and lasting the harm to the victim. Id. at **7-8. Notably, defendant's conduct in this case is significantly worse, as it involved hundreds of victims, some images of juveniles, and sextortion and threats to the victims.

United States v. Barrett, CR 09-115-R, cited by defendant, does not support a lower sentence. In that case, the defendant was convicted of stalking one victim (who was famous) and using a camera to videotape her through hotel peep holes. Barrett then uploaded the images of that victim onto the Internet and tried to sell them to a news organization. Law enforcement later discovered that Barrett had also uploaded approximately 15 or 16 more videos of unknown women on to the Internet. Barrett never contacted his victims directly, nor interacted with them, nor forced them to do anything. He was sentenced to 30 (not 27) months' imprisonment. In contrast, defendant has over 370 known victims, and he committed his

24

crime by contacting them directly, and terrorizing them.  Over 1,100 naked or semi-naked pictures were found on his computer. Defendant's case is significantly worse in terms of both quantity and quality, and deserves a much greater sentence.

In sum, courts have repeatedly recognized that the type of crime for which defendant has been convicted warrants a greater sentence than that called for by the Guidelines.  In order to minimize sentencing disparity among similarly situated defendants, an above-guideline sentence is appropriate in this case as well. Given defendant's extensive victimization, repeated extortion and threats, and other aspects of his offense, a 72 month sentence is appropriate and not greater than necessary.

**V.    CONCLUSION**

For the foregoing reasons, the government requests that the Court impose a sentence of 72 months' imprisonment, followed by a three year period of supervised release.